FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

SEP 2 0 2010

GREGORY C. LANGHAM
CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

ROBERT STINSON, JR.;
LIFE'S GOOD, INC.;
LIFE'S GOOD STABL MORTGAGE FUND, LLC;
LIFE'S GOOD HIGH YIELD MORTGAGE
    FUND, LLC;
LIFE'S GOOD CAPITAL GROWTH FUND, LLC;
IA CAPITAL FUND, LLC;
KEYSTONE STATE CAPITAL CORPORATION,

Defendants, and

FIRST COMMONWEALTH SERVICE COMPANY;
SUSAN L. STINSON;
CHRISTINE A. STINSON;
MICHAEL G. STINSON;
LAURA MARABLE,

Relief Defendants.

CIVIL ACTION NO.

10-MC-0064

**NOTICE OF FILING OF COMPLAINT AND ORDERS**
**APPOINTING RECEIVER PURSUANT TO 28 U.S.C. § 754**

By Order of the United States District Court for the Eastern District of Pennsylvania,

entered on September 13, 2010, Kamian Schwartzman, Esquire was appointed the receiver (the

"Receiver") for the Receivership Estate established by Order of Court dated September 10, 2010

(the "Receivership Order"), which includes all assets of Robert Stinson, Jr.; Life's Good, Inc.;

Life's Good STABL Mortgage Fund, LLC; Life's Good High Yield Mortgage Fund, LLC; Life's

Good Capital Growth Fund, LLC; IA Capital Fund, LLC; Keystone State Capital Corporation;

Susan L. Stinson; First Commonwealth Service Company; Christine A. Stinson; Michael G.

Stinson; and Laura Marable (collectively, the "Source Entities"), along with any entities owned or controlled by the Source Entities or in which any of them have an interest, and any other assets that may be collected by the Receiver.

Pursuant to 28 U.S.C. § 754, the Receiver hereby files:

- A copy of the S.E.C.'s Complaint against the Source Entities (attached as Exhibit A);

- A certified copy of the Receivership Order (attached as Exhibit B);

- A certified copy of the Order appointing Receiver and Receiver's Counsel (attached as Exhibit C).


Respectfully submitted,

**PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP**

By: _____
GAETAN J. ALFANO, ESQUIRE
J. PETER SHINDEL, JR., ESQUIRE
I.D. Nos. 32971, 201554
1818 Market Street, Suite 3402
Philadelphia, PA 19103
(215) 320-6200

*Counsel for Kamian Schwartzman, Esq., Receiver*

Dated: September 17, 2010

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| Plaintiff | : | Civil Action No. |
| | : | |
| v. | : | |
| | : | |
| ROBERT STINSON, JR. | : | |
| LIFE'S GOOD, INC. | : | |
| LIFE'S GOOD STABL MORTGAGE FUND, LLC | : | |
| LIFE'S GOOD HIGH YIELD MORTGAGE | : | |
| FUND, LLC | : | |
| LIFE'S GOOD CAPITAL GROWTH FUND, LLC | : | |
| IA CAPITAL FUND, LLC, and | : | |
| KEYSTONE STATE CAPITAL CORPORATION | : | |
| | : | |
| Defendants, | : | |
| | : | |
| FIRST COMMONWEALTH SERVICE COMPANY | : | |
| SUSAN L. STINSON | : | |
| CHRISTINE A. STINSON | : | |
| MICHAEL G. STINSON | : | |
| LAURA MARABLE | : | |
| | : | |
| Relief Defendants. | : | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

### SUMMARY

1.     This action involves an ongoing offering fraud and Ponzi scheme being conducted

by Robert Stinson, Jr. ("Stinson"), a convicted felon and securities fraud recidivist, through a

number of entities under his control, including Life's Good, Inc. ("Life's Good"), Keystone State

Capital Corporation ("Keystone"), and four purported hedge funds: Life's Good STABL

Mortgage Fund, LLC, Life's Good High Yield Mortgage Fund, LLC, Life's Good Capital Growth

Fund LLC, and IA Capital Fund, LLC (collectively, the "Life's Good Funds" and together with Stinson, Life's Good, and Keystone, the "Defendants").

2.　From at least 2006 through the present, Stinson, through Life's Good and Keystone, has raised at least $16 million from more than 140 investors, by selling purported "units" in the Life's Good Funds to, among others, investors who hold self-directed IRAs. As part of the fraud, Stinson misrepresents to investors that the Life's Good Funds originate and hold for investment short-term commercial mortgage loans, generating annual returns of 10 to 16 percent through loan-fees, interest income, and operating income from real properties acquired in foreclosure.

3.　In reality, Stinson has been stealing money for his own personal use; transferring money to family members and others, including relief defendants Susan L. Stinson, Christine A. Stinson, Michael G. Stinson, Laura Marable, and First Commonwealth Service Company (collectively, the "Relief Defendants"), as well as using new investors' funds to make "distributions" to existing investors.

4.　This fraud is ongoing. Of the $16 million raised since 2006, at least $12.1 million was raised between April 2009 and May 2010. In May 2010 alone, Stinson raised approximately $2.3 million from at least 30 investors.

5.　By virtue of the conduct alleged herein, all of the Defendants directly or indirectly, singly or in concert, have engaged, are engaging, and unless restrained and enjoined will continue to engage in acts, practices, schemes and courses of business that constitute violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)]; and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder. [17 C.F.R.§ 240.10b5].

2

## JURISDICTION AND VENUE

6.     The Commission brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], to enjoin such acts, transactions, practices, and courses of business; obtain disgorgement and civil penalties; and for other appropriate relief.

7.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

8.     Venue lies in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the Defendants are inhabitants of, and certain of the acts, transactions, practices and courses of business constituting the violations alleged herein occurred within, the Eastern District of Pennsylvania.

9.     In connection with the conduct alleged in this Complaint, the Defendants directly or indirectly, singly or in concert, made use of the means or instrumentalities of transportation or communication in, or instrumentalities of, interstate commerce, or the mails, or the facilities of a national securities exchange.

## THE DEFENDANTS

10.     Defendant Stinson, age 55, is a resident of Berwyn, Pennsylvania. Stinson was previously charged by the Commission with federal securities fraud in a civil action filed in May 1990 (the "1990 Action"). The 1990 Action resulted in an October 23, 1990 judgment, permanently enjoining Stinson and his co-defendants from violating the anti-fraud provisions of the Securities Act and the Exchange Act and ordering them to pay $7,680 in disgorgement and prejudgment interest. This debt was never paid.

11.     Stinson also has a criminal history, including three convictions on federal charges of fraud and/or larceny, and two convictions on state charges of conspiracy and/or fraud. With his former wife, Relief Defendant Laura Marable ("Marable"), Stinson twice filed for bankruptcy protection in the United States Bankruptcy Court for the Eastern District of Pennsylvania.

12.     Defendant Life's Good is a Delaware corporation organized in September 2005. Its stated purpose is to "market health products and publishing." According to information provided on its website, www.lifesgoodabundance.com (the "Website"), and in the offering materials described below, Life's Good is the Life's Good Funds' "portfolio manager," and "fund manager," and is a private equity financial services company which, along with certain subsidiaries and affiliates, manages investments in the Life's Good Funds. According to public documents, Life's Good has offices in Chesterbrook, Pennsylvania. Stinson and Stinson's wife, Relief Defendant Susan L. Stinson, are among its officers.

13.     Defendant Keystone is a Nevada corporation with offices in Chesterbrook, Pennsylvania, purportedly engaged in "real estate investment." According to information on the Website and in the offering materials further described below, Keystone is Life's Good's "financial Consultant Company" and a "self-directed IRA facilitator for offering a large range of

4

retirement products through their IRA custodian." Its officers include Stinson and Stinson's wife, Relief Defendant Susan L. Stinson.

14.     Defendant Life's Good STABL Mortgage Fund, LLC ("STABL Fund") is a limited liability corporation organized on or about September 29, 2006 under the laws of Pennsylvania, with a business address in Chesterbrook, PA. Its stated purpose is "real estate," and Stinson is the only identified officer.

15.     Defendant Life's Good Capital Growth Fund, LLC ("Capital Growth Fund") is a limited liability corporation organized on or about January 28, 2008 under the laws of Pennsylvania, with a business address in Philadelphia, PA 19103. Its stated purpose is "real estate," and Stinson is the only identified officer.

16.     Defendant Life's Good High Yield Mortgage Fund, LLC ("High Yield Fund") is a limited liability corporation organized on or about January 9, 2009 under the laws of Pennsylvania, with a business address in Philadelphia, PA 19123. Its stated purpose is "real estate," and Stinson is the only identified officer.

17.     Defendant IA Capital Fund, LLC ("IA Capital Fund") is a limited liability corporation organized on or about January 28, 2008 under the laws of Pennsylvania, with a business address in Philadelphia, PA 19123. Its stated purpose is "real estate," and Stinson is the only identified officer.

18.     None of Stinson, Life's Good, Keystone, or the Life's Good Funds is registered with the Commission, the Financial Industry Regulatory Authority ("FINRA"), or Pennsylvania authorities as a broker-dealer, investment adviser, or associated with the same.

## THE RELIEF DEFENDANTS

19.     Relief Defendant First Commonwealth Service Company ("First Commonwealth") is a corporation organized on or about June 10, 1983 under the laws of Pennsylvania, with a business address of 813 N. 5th Street, Suite 106, Philadelphia, PA 19123. Public records identify Stinson's brother as president of First Commonwealth. During an Internet presentation in November 2007, further described below, Stinson identified First Commonwealth as a "23 year old company" just purchased by Life's Good which should be "up and running" on January 1, 2008. According to the Website and the offering materials further described below, First Commonwealth is the Life's Good affiliate that enables Life's Good to provide residential mortgages to individual consumers. First Commonwealth received at least $440,000 from bank accounts holding investor funds and, on information and belief, has no legitimate claim to those funds.

20.     Relief Defendant Susan L. Stinson resides in Berwyn, Pennsylvania, and is the wife of Stinson. She is the President and Treasurer of Life's Good, an officer of Keystone, and she is a co-signatory with Stinson on at least 6 of the 20 bank accounts discussed below. As a joint account holder with Stinson on certain financial accounts, Susan Stinson received at least $388,450 from bank accounts holding investor funds. On information and belief, Susan Stinson has no legitimate claim to those funds.

21.     Relief Defendant Christine A. Stinson resides in Willow Grove, Pennsylvania and, on information and belief, is related to Stinson. Christine Stinson received at least $72,000 from bank accounts holding investor funds and, on information and belief, has no legitimate claim to those funds.

22.     Relief Defendant Michael G. Stinson is Stinson's son, and is the Vice-President of Life's Good and an officer of at least one affiliated company. He resides in Berwyn, Pennsylvania. Michael Stinson received at least $30,000 from bank accounts holding investor funds and, on information and belief, has no legitimate claim to those funds.

23.     Relief Defendant Laura Marable resides in or around Volcano, Hawaii, is the ex-wife of Stinson, and was a co-defendant in the 1990 Action. Ms. Marable received at least $98,000 from bank accounts holding investor funds and, on information and belief, has no legitimate claim to those funds.

## THE FRAUD

### Solicitations for Investments in the Life's Good Funds

24.     At all times relevant to the facts alleged in this Complaint, defendants Life's Good, STABL Fund, High Yield Fund, Capital Growth Fund, IA Capital Fund, and Keystone (collectively, the "Entity Defendants") acted by and through Stinson.

25.     Since at least 2006, the Defendants have targeted and solicited, by material misrepresentations and omissions, investors' retirement and other funds, only to misappropriate these investments for the personal benefit of Stinson, his family members and others, and to pay other investors.

26.     All of the misrepresentations and omissions set forth herein, individually and in the aggregate, are material. There is a substantial likelihood that a reasonable investor would consider the misrepresented facts and the omitted information important, and/or that disclosure of the omitted facts or accurate information would alter the "total mix" of information made available to investors.

27.     In connection with the conduct described herein, the Defendants acted knowingly and/or recklessly. Among other things, the Defendants knew or were reckless in not knowing that they were making material misrepresentations and omitting material information at all times that they solicited investments and/or provided solicitation materials to investors or prospective investors.

28.     As set forth below, the Defendants solicit investments in the Life's Good Funds through various media, including an offering document, websites, investor newsletters, e-mails, and Internet presentations, all containing misrepresentations about, among other things, investment income, investment security, investment returns, and/or use of investor funds. For example, with respect to the STABL Mortgage Fund, Stinson promised that "every single dollar" would be invested in real estate. In other solicitations, the Defendants describe the Life's Good Funds as "safe", "risk free" and "protected by our safe and secure lending methods."

29.     The interests, or "units," sold to investors by the Defendants in the STABL Fund, High Yield Fund, Capital Growth Fund, and IA Capital Fund are securities within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)], and the fraud and other misconduct described herein was in connection with the offer and sale of securities.

30.     As set forth more fully below, in the 13 months beginning on April 1, 2009, the Defendants have used millions of dollars invested by investors in the STABL Fund, as well as the other Life's Good Funds, for purposes other than real estate investment, including to fund lavish spending involving restaurants, yachts, automobiles, baseball games and travel. They further have been using investor funds to make payments to other investors in the Life's Good Funds, ostensibly as "investment returns."

## *Direct Solicitation Through E-mail and an Offering Memorandum*

31.     The Defendants solicit investments in the Life's Good Funds directly from investors through e-mail and an offering document which, collectively, include descriptive material regarding the Life's Good Funds, their purpose and management, their holdings, and their purported rates of return.

32.     An e-mail sent to at least one potential investor describes an annual "fixed rate of [return of] 16%" for the STABL Fund and represents that an investment in the STABL Fund will "double your money every 4.5 years." According to the e-mail, investors have the "the right to self-direct [their] 401(k) or I.R.A. at this very same fixed rate of 16%."

33.     A 46-page attachment to the e-mail dated December 31, 2008 (the "Report"), created by or at the direction of Stinson, provides further information on the purported investments in Life's Good Funds. The Report contains a signed certification by Stinson that the Report does not contain any false statements or omissions.

34.     In a "Letter to Members" included in the Report, Stinson states that an investment in Life's Good Funds will generate "a very handsome return, which can be as much as 30%."

35.     The Report also states:

    a.     "Units" in the Life's Good Funds are offered for sale to investors for $2,000 to $5,000 each; more than $30 million has been raised through the end of 2008; and returns can be realized "over time and/or quarterly cash distributions and capital appreciation;"

    b.     Investments in the Life's Good Funds are managed by originating and holding for investment short-term senior commercial mortgage loans, secured by real property in the United States, primarily in the Philadelphia

area, with investment returns generated through loan-fee income from the origination and extension of loans; interest income; and operating income from real properties acquired in foreclosure. The Life's Good Funds originated $34,285,714 in mortgage loans during 2008, generating income through a (generally) 19 percent rate of interest, and through origination fees; and

c.      As of December 2008, 99 percent of the principal balance in the Life's Good Funds' portfolio consisted of first mortgage loans or joint participation in first mortgage loans.

36.   The Report also states that the Life's Good Funds yielded an average aggregate 2008 annual return of 13.3 percent, with the following returns on investment by fund:

a.      STABL Fund:  16 percent fixed;

b.      Capital Growth Fund:  14 percent fixed plus capital appreciation;

c.      High Yield Fund:  10 percent fixed plus one-time dividend; and

d.      IA Capital Fund:  16 percent fixed.

37.   The Report further contains a section entitled "Fund Financials, Notes, and Certifications," which includes financial statements as of December 31, 2008, and a purported unqualified audit opinion regarding the consolidated financial statements of the Life's Good Funds for the period ended December 31, 2008 (the "Consolidated Financial Statements") by an "independent registered public accounting firm," Johnson and Johnson Public Accountants, Inc.

38.   There is no record of Johnson and Johnson Public Accountants, Inc. as an accounting firm licensed in Pennsylvania, and these "audited" statements contain numerous errors and inconsistencies.

39.     Further, these financial statements do not support the claims in the Report that the Life's Good Funds generate annual rates of return as high as 16 percent. According to the financial statements, the "members'" equity for 2008 was $31,123,203, and Life's Good Funds had earnings of $2,685.80, equating to a return of less than 1 percent. Based on this calculation, as well as other information discernible from the Consolidated Financial Statements of the Life's Good Funds included in the Report, the Life's Good Funds are not generating a rate of return of 10 to 16 percent.

40.     As described more fully below, the Life's Goods Funds not only are generating no apparent return from operations, the promised return on investment, at times paid to investors as quarterly distributions, is funded by new investor funds and not by ongoing operations.

### *Webinar Solicitation*

41.     In November 2007, Stinson gave a presentation as part of an online investor webinar sponsored by an IRA Custodian identified herein as IRA Custodian A (the "Webinar").

42.     This presentation was publicly available on the Internet, as was an accompanying PowerPoint presentation. It was part of IRA Custodian A's "Wednesday Webinar Series" and was entitled, "Green Investments and Community Improvement Projects: Find out how Investors are using self-directed IRA assets to fund these investments."

43.     During the introduction to the Webinar, the moderator introduces Stinson and the Life's Good Funds as a "private real estate hedge fund projecting 16 percent returns." Identifying the STABL Fund as Life's Good's "primary hedge fund," Stinson states that when an investor invests in Life's Good real estate mortgage funds, "each quarter, that check comes to you regardless of what's going on, every single quarter."

11

44. Further, Stinson states that "every single dollar" invested in the STABL Fund is invested in real estate, and that the STABL Fund is responsible for "400 something homes."

45. The accompanying PowerPoint presentation created by, or at the direction of, Stinson, includes the representation that the STABL Fund is "expected to provide a 16% annual net return, with strong quarterly cash dividends, with low downside risk, which outperform equities and long-term bonds."

### *Solicitation Through Websites and a Newsletter*

46. The Defendants also solicit investments through affiliated websites.

47. For example, the Website, created by, or at the direction of Stinson, describes the principal executives of Life's Good, including Stinson, as having "vast experience in this highly specialized segment of the real estate industry," and as providing "oversight and management of the daily operations of the company... the team has a proven track record in generating high returns and profits on behalf of its extensive list of private investors."

48. The Website further describes Life's Good as a "Private Equity Financial Service Company," providing "short-term financing for distressed properties, through the management of three primary funds: two private real estate hedge funds and one real estate capital investment fund." The description continues: "Client returns are generated through loan-fee income and interest income, gained through the sale of investment properties, in addition to investment income received through foreclosure property sales."

49. Public records reveal no significant real property holdings in the name(s) of Stinson or the Entity Defendants that would support the representation that returns are generated through the sale of property through foreclosure or otherwise. As set forth below, the Defendants' bank accounts similarly do not support this representation.

50.     Linked to the Website is a 27-page investor newsletter created by, or at the direction of, Stinson, for the third quarter, 2009 (the "Newsletter").  According to the Newsletter, Life's Good Funds "have done extremely well over the last three years," are "protected by our safe and secure lending methods," and that they "should outperform the market and our benchmarks in the foreseeable future."

51.     The Newsletter further states that Keystone, "through its STABL and High Yield Mortgage Funds . . . offers investors the opportunity to earn higher than average consistent rates of returns while maintaining safety of their principal along the way," and that Life's Good proves itself "by continuing to generate reliable absolute returns.  We want every one of our investors to know we are safe, risk-free, and deliver higher yields than most. . . .We ensure consistent performance with minimal risk."

52.     Solicitation also occurs through the Keystone Website, www.Keystonestatecapital.com, a link to which is provided in the Newsletter.  Visitors to that website are required to register and log-in with a username and password to receive additional information about investing in the Life's Good Funds.

### *E-mails to Industry Professionals*

53.     The Defendants also target industry professionals in solicitation efforts.  For example, in 2008, Stinson sent an e-mail to an Atlanta, Georgia-based investment adviser (the "Georgia e-mail").  In the Georgia e-mail, Stinson states that the Life's Good Funds offer annual rates of return ranging from 14 to 16 percent.  Stinson attached to the Georgia e-mail brochures describing the STABL Fund and the Capital Growth Fund, which promise the same purported rates of return.

**The Defendants Are Misrepresenting Both the Source of Life's Good Funds'
Income and the Use of Investor Funds.**

54.     Defendants have misrepresented, and continue to misrepresent, both the source of
the Life Good Funds' income, including the purported generation of 10 to 16 percent returns, as
well as the use of investor proceeds.

*Investors Are the Predominant Source of Bank Account Income*

55.     Contrary to the representations of the Defendants in the solicitations referenced
above, the Life's Good Funds are not generating any significant income through loan-fees,
interest, or operations of properties acquired in foreclosure. Rather, the "income" generated by
the Defendants' activity is almost entirely comprised of investor funds.

56.     Since 2006, Defendants have raised $16 million from at least 140 investors in the
Life's Good Funds, with approximately 73% invested in the STABL Fund.

57.     The Defendants used at least 20 separate bank accounts, all controlled by Stinson
to receive, move, and ultimately distribute investor funds (the "Bank Accounts"). As of April 1,
2009, the Bank Accounts held an aggregate amount of just under $36,000.

58.     During the ensuing 13 months, from April 1, 2009 through May 31, 2010, the
Defendants raised at least $12.1 million from investors with approximately $9.2 million
originating from retirement accounts maintained through IRA Custodians. This level of
investment from IRA accounts is consistent with the Defendants' efforts to target self-directed
IRA holders.

59.     Overall, during this 13-month period, at least 92 percent of all new money
deposited into the Bank Accounts came from investors.

60.     The Defendants did not segregate investor funds.  Rather, during this period the Defendants commingled investor funds and moved investor funds between and among all the Bank Accounts.

### *Misuse and Misappropriation of Funds for Expenses and Personal Benefit*

61.     Also during the 13-month period beginning April 1, 2009, the Defendants distributed at least $9,223,083 from the Bank Accounts.

62.     Notwithstanding Stinson's representation in the Webinar that "every single dollar" of the STABL Fund is invested in real estate, a significant portion of the funds expended from the Bank Accounts, including funds from Bank Accounts in the name of the STABL Fund, has been used to pay periodic "distributions" to investors, to pay Stinson personally, to pay Stinson's friends and family, and to pay other costs and expenses.

63.     During the 13-month period, Stinson received $411,250 in payments directly and also through accounts that he holds jointly with Susan L. Stinson; Relief Defendant Marable received approximately $100,000; Relief Defendant Christine A. Stinson received at least $72,000; and Relief Defendant Michael G. Stinson received at least $30,000.  In addition, Relief Defendant First Commonwealth, apparently run by Stinson's brother and identified as the mortgage unit of Life's Good, received approximately $440,000 despite generating no apparent income for the Defendants.

64.     In addition to the payments to Stinson and the Relief Defendants, the Defendants used investor funds during the 13 month period to pay for expenses such as dining, travel, and entertainment.  These payments included approximately $1.5 million in purported payroll expenses, notwithstanding the lack of any apparent operational business, and over $900,000 in debit card charges.  By way of examples:

15

a.   On March 4, 2010, a debit card statement from one of the Bank Accounts reflects charges at two separate steak houses: $793.10 at Fogo De Chao and 759.33 at Del Frisco's; and $471.93 spent at the Men's Wearhouse;

b.   Between April 2009 and May 2010 alone, debit card statements from the Bank Accounts reflect almost $11,000 spent at Citizen's Bank (Baseball) Park, with each trip averaging about $500. During the same time period, the statements reflect more than $51,000 on hotels primarily in Florida, including one bill for $7,844 at the Breakers Hotel in Palm Beach; and

c.   On January 28 2010, $21,810 was paid to Neptune Yachting from one of the Bank Accounts, which according to its website, rents luxury yachts. Moreover, on May 10, 2010, Stinson issued a check from one of the Bank Accounts for $68,000 to Mercedes Benz of Fort Washington, PA, presumably to purchase a car.

### Misuse of Proceeds -- Ponzi Payments

65.    Defendants also used new investor money to fund distributions to Life's Good Funds' investors.

66.    During the 13- month period beginning on April 1, 2009, the Defendants paid at least $915,000 from the Bank Accounts to investors in the Life's Good Funds through checks signed by Stinson or wire transfers. Several of the checks signed by Stinson to investors contain the notation "quarterly distribution."

67.    By way of further illustration of the misappropriation and misuse of investor funds:

16

a.  On June 26, 2009, an investor ("Investor B") wired $195,025 into the STABL Fund bank account. At the time, there was $112.38 in this STABL Fund bank account, and no deposits were made in the account through the end of June. Beginning on June 29, 2009, over $110,000 was distributed, either directly or through a Bank Account in the name of Life's Good, to investors, including Investor B. Indeed, Investor B's June 26, 2009 investment funded a Life's Good check to Investor B dated June 29, 2009 for $2,542, with the notation "2nd QTR. DISTR."

b.  Also on June 29, 2009, $2,000 was transferred from the STABL Fund bank account to a personal bank account in the name of Stinson and his wife, Susan Stinson, and $1,000 was transferred by wire to an account in the name of Christine Stinson.

c.  On June 30, 2009, an additional $34,000 was transferred from the STABL Fund bank account to a Life's Good bank account linked to a debit card ("Debit Card Account") routinely used to pay expenses unrelated to loan or rehabilitation activities. During the next two days, the debit card was used to pay an $85.60 cell phone bill, $137.20 to the car sharing service Zipcar, and over $50 for pizza. Moreover, $21,000 was transferred from the Debit Card Account to another Bank Account in the name of Life's Good, which issued a wire transfer on July 2, 2009 for $2,000, directed to a personal bank account in Stinson's name. In total, by the day following Investor B's investment of approximately $195,000 in the STABL Fund, which

constituted almost the entire balance of the STABL Fund bank account,

approximately $173,000 was disseminated in the manner outlined above.

### *Misrepresentations Regarding the Consolidated Financial Statements and Failure to Disclose Criminal and Regulatory History*

68.     The Defendants have misrepresented that the Consolidated Financial Statements were audited by an independent, registered, accounting firm.

69.     The Defendants have failed to disclose Stinson's multiple criminal convictions, the 1990 Action, and/or his bankruptcy filings.  Without such disclosures, the Defendants' solicitations, and in particular, their descriptions of senior management were, and are, materially misleading.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by all Defendants

70.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 69, inclusive, as if the same were fully set forth herein.

71.     From at least 2006 through the present, as a result of the conduct alleged herein, Defendants Stinson, Life's Good, STABL Fund, High Yield Fund, Capital Growth Fund, IA Capital Fund, and Keystone, knowingly or recklessly, in connection with the offer, purchase, or sale of securities, directly or indirectly, singly or in concert, by the use of the means or instruments of transportation or communication in interstate commerce, or the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

(a)     employed devices, schemes or artifices to defraud;

(b)      obtained money or property by means of, or made, untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, transactions, practices, or courses of business that operated as a fraud or deceit upon offerees, purchasers, and prospective purchasers of securities.

72.      By engaging in the foregoing conduct, Defendants Stinson, Life's Good, STABL Fund, High Yield Fund, Capital Growth Fund, IA Capital Fund, and Keystone have violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b-5], thereunder.

## SECOND CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act by all Defendants

73.      The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 72, above, as if the same were fully set forth herein.

74.      There was no registration statement in effect for the offer or sale of units in the STABL Fund, High Yield Fund, Capital Growth Fund, and/or the IA Capital Fund, and no exemption from registration applies to the offer or sales of those units.

75.      Stinson, Life's Good, STABL Fund, High Yield Fund, Capital Growth Fund, IA Capital Fund, and Keystone, by engaging in the conduct described above, directly or indirectly, singly or in concert, in connection with a security for which no registration statement was in effect, and in the absence of any applicable exemption from registration:

(a)      made use of a means or instrument of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b)    carried or caused to be carried through the mails or in interstate commerce, by any means or instrument of transportation, such security for the purpose of sale and/or for delivery after sale; and/or

(c)    made use of a means or instrument of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy such security through the use or medium of a prospectus or otherwise.

76.    By reason of the foregoing, Stinson, Life's Good, STABL Fund, High Yield Fund, Capital Growth Fund, IA Capital Fund, and Keystone violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## THIRD CLAIM FOR RELIEF

### Relief Defendants

77.    The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 76, inclusive, as if the same were fully set forth herein.

78.    Relief Defendants Susan L. Stinson, Christine A. Stinson, Michael G. Stinson, Laura Marable, and First Commonwealth each received proceeds of the fraud described herein, over which they each have no legitimate claim.

79.    By reason of the foregoing, Relief Defendants Susan L. Stinson, Christine A. Stinson, Michael G. Stinson, Laura Marable, and First Commonwealth have been unjustly enriched and must be compelled to disgorge the amount of their unjust enrichment.

**WHEREFORE**, the Commission respectfully requests that this Court enter a final judgment:

I.

20

Permanently restraining and enjoining Defendants Stinson, Life's Good, STABL Fund, High Yield Fund, Capital Growth Fund, IA Capital Fund, and Keystone from violating Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b5], thereunder;

## II.

Ordering all Defendants and Relief Defendants to disgorge any and all ill-gotten gains, together with prejudgment interest, derived from the activities set forth in this Complaint.

## III.

Ordering all Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

## IV.

Granting such other and further relief as the Court may deem just and appropriate; and

## V.

Retaining jurisdiction of this action for purposes of enforcing any Final Judgment(s) and Order(s).

Dated:  June 29, 2010

Respectfully submitted,

___s/Catherine E. Pappas_____
Daniel M. Hawke
Elaine C. Greenberg
G. Jeffrey Boujoukos (PA #67215)
Catherine E. Pappas (PA #56544)
Brendan P. McGlynn (PA #77271)
Kelly L. Gibson (PA #91753)

Attorneys for Plaintiff:

**SECURITIES AND EXCHANGE COMMISSION**
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA  19106
Telephone:  (215) 597-3100
Facsimile:  (215) 597-2740
pappasc@sec.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : : : | |
| Plaintiff | : : | Civil Action No. 10-CV-03130 (BMS) |
| v. | : : | |
| ROBERT STINSON, JR.<br>LIFE'S GOOD, INC.<br>LIFE'S GOOD STABL MORTGAGE FUND, LLC<br>LIFE'S GOOD HIGH YIELD MORTGAGE<br>    FUND, LLC<br>LIFE'S GOOD CAPITAL GROWTH FUND, LLC<br>IA CAPITAL FUND, LLC<br>KEYSTONE STATE CAPITAL CORPORATION | : : : : : : : : : : : | |
| Defendants, and | : : | |
| FIRST COMMONWEALTH SERVICE COMPANY<br>SUSAN L. STINSON<br>CHRISTINE A. STINSON<br>MICHAEL G. STINSON<br>LAURA MARABLE | : : : : : | |
| Relief Defendants. | : : : | |

A TRUE COPY CERTIFIED TO FROM THE RECORD
DATED : _____ 9/14/10 _____
ATTEST: _Terry Milano_
DEPUTY CLERK, UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

## ORDER ESTABLISHING RECEIVERSHIP ESTATE

**WHEREAS** this matter has come before this Court upon motion of the Securities and
Exchange Commission ("SEC" or "Commission") to appoint a receiver in the above- captioned
action;

**WHEREAS** the Court finds that, based on the record in these proceedings, the
appointment of a receiver in this action is necessary and appropriate for the purposes of assisting
the Court in determining whether sufficient assets exist for purposes of a distribution to

Life's Good STABL Mortgage Fund, LLC, Life's Good High Yield Mortgage Fund, LLC, Life's Good Capital Growth Fund, LLC, and IA Capital Fund, LLC (collectively, the "Life's Good Funds"); and those assets of Defendants Robert Stinson, Jr., Life's Good, Inc. and Keystone State Capital Corporation, and Relief Defendants Susan L. Stinson, First Commonwealth Service Company, Christine A. Stinson, Michael G. Stinson, and Laura Marable, and others, that: (a) are attributable to funds derived from investors in or with the Life's Good Funds; (b) are held in constructive trust for one or more of the Life's Good Funds; (c) were fraudulently transferred from the Life's Good Funds; and/or (d) may otherwise be includable as assets of the Estates of the Life's Good Funds (collectively, the "Recoverable Assets"); and

**WHEREAS** the Court finds that, based on the record in these proceedings, that all of the assets of Defendants Robert Stinson, Jr., Life's Good, Inc., and Keystone State Capital Corporation are presumptively Recoverable Assets; and

**WHEREAS** the Court finds that, based on the record in these proceedings, all of the assets of Relief Defendants Susan L. Stinson, First Commonwealth Service Company, Christine A. Stinson, Michael G. Stinson, and Laura Marable are presumptively Recoverable Assets; and

**WHEREAS** this Court has subject matter jurisdiction over this action and personal jurisdiction over the Defendants, and venue properly lies in this district;

NOW, this 10 day of Sept, 2010, it is **THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

## Receivership Property and Receivership Records

1.     This Court takes exclusive jurisdiction and possession of the assets, including without limitation monies, securities, choses in action, and properties, real and personal, tangible and intangible, of whatever kind and wherever situated, of the Defendants and Relief Defendants:  Robert Stinson, Jr., Life's Good, Inc., Life's Good STABL Mortgage Fund, LLC, Life's Good High Yield Mortgage Fund, LLC, Life's Good Capital Growth Fund, LLC, IA Capital Fund, LLC, Keystone State Capital Corporation, Susan L. Stinson, First Commonwealth Service Company, Christine A. Stinson, Michael G. Stinson, and Laura Marable (collectively, the "Source Entities"), and/or any entities that the Source Entities own or control or in which any of them have an interest, as well as any other assets that may be collected in the captioned matter ("Receivership Property"); provided, however, that criminal authorities may retain Receivership Property in their possession, custody, or control, and, subject to paragraph 5, below, may continue to hold Receivership Property through the appointment of a Receiver..

2.     This Court hereby further takes exclusive jurisdiction and possession of the books, records, computers, and documents, including without limitation, every writing of any kind, type, and description or other instrument or device by which, through, or upon which information has been recorded or preserved, including without limitation memoranda, notes, letters, bank records, statements, checks, wire instructions and confirmations, tape recordings, electronic and digital media of all types, audio and video recordings, and photographs of the Life's Good Funds and/or any and all entities the Life's Good Funds own or control, or in which any of them has an interest, including without limitation, trusts, limited liability companies,

corporations, partnerships, and joint ventures, as well as all such books records, computers and

documents of the Source Entities relating to Receivership Property (collectively, the

"Receivership Records"); provided, however, that the Commission and criminal authorities may

retain copies of any such records in their possession, custody, or control, and, subject to

paragraph 6, below, may continue to hold Receivership Records through the appointment of a

Receiver.

### Obligations of Source Entities Upon Entry of This Order

3.     Within thirty (30) days of the entry of this Order, the Source Entities shall file

with the Court and serve upon the Commission a sworn statement and accounting, with complete

documentation, covering the period from January 1, 2004 to the present:

     A.     Of all Receivership Property, wherever located, held by or in the name of the Source Entities, or in which any of them, directly or indirectly, has or had any beneficial interest, or over which any of them maintained or maintains and/or exercised or exercises control, including without limitation: (a) all securities, investments, funds, real estate, automobiles, jewelry and other assets, stating the location of each; and (b) any and all accounts, including without limitation all funds held in such accounts, with any bank, brokerage or other financial institution held by, in the name of, or for the benefit of any of them, directly or indirectly, or over which any of them maintained or maintains and/or exercised or exercises any direct or indirect control, or in which any of them had or has a direct or indirect beneficial interest, including without limitation the account statements from each bank, brokerage or other financial institution;

     B.     Identifying every account at every bank, brokerage or other financial institution: (a) over which Source Entities have signatory authority; and (b) opened by, in the name of, or for the benefit of, or used by, the Source Entities;

     C.     Identifying all credit, bank, charge, debit or other deferred payment card issued to or used by each Source Entity, including without limitation the issuing institution, the card or account number(s), all persons or entities to which a card was issued and/or with authority to use a card, the balance of each account and/or card as of the most recent billing statement, and all statements for the last twelve months;

D.   Of all assets received by any of the Source Entities from any person or entity, including without limitation the value, location, and disposition of any assets so received;

E.   Of all funds received by the Source Entities, and each of them, in any way related, directly or indirectly, to the conduct alleged in the Commission's Complaint in the captioned action. The submission must clearly identify, among other things, all investors, the securities they purchased, the date and amount of their investments, and the current location of such funds;

G.   Of all expenditures exceeding $1,000 made by any of the Source Entities, including without limitation those made on their behalf by any person or entity;

H.   Of all transfers of assets made by any of the Source Entities; and

I.   Of all claims or prospective claims against the Life's Good Funds and/or Receivership Property, including without limitation the amount of the claim and/or prospective claim, and the names, addresses, and contact information of claimants or prospective claimants, and including without limitation any claims of the Source Entities against Receivership Property.

## Appointment of Receiver

4.   By further Order of this Court, a Receiver will be identified and appointed to serve as the Receiver ("Appointment Order") to assume control of, marshal, pursue, and preserve the Receivership Property with the objective of maximizing the recovery of defrauded investors, and, to the extent that assets recovered are sufficient for a distribution but inadequate to make defrauded investors whole, ensuring that the distribution of those assets is as just and equitable as practicable. No bond shall be required to assure the Receiver's conscientious performance of the duties and responsibilities imposed by this Order. With the Court's approval, and subject to paragraphs 41-48, below, the Receiver and those appointed to assist the Receiver in his/her/its duties (collectively, the "Receiver and Staff") shall be compensated from the Receivership Estate for all reasonable fees and costs.

5.     Upon entry of the Appointment Order, the Receiver is authorized on behalf of the Court to take immediate possession of the Receivership Property, and all persons and entities having control, custody or possession of any Receivership Property are hereby directed to turn the same over to the Receiver; provided, however, that criminal authorities may retain Receivership Property in their possession, custody, or control by agreement with the Receiver.

6.     Upon entry of the Appointment Order, the Receiver is authorized on behalf of the Court to take immediate possession of the Receivership Records and all persons and entities having control, custody or possession of any Receivership Records are hereby directed to turn the same over to the Receiver; provided, however, that the Commission and criminal authorities may retain copies of any such records in their possession, custody, or control and may, by agreement, share possession of the originals with the Receiver; and will be permitted access to Receivership Records upon request.

7.     To enable the Receiver to carry out Receivership duties hereunder, upon entry of the Appointment Order, the Receivership Property is released from the Asset Freeze imposed by this Court by Orders entered with the consent of the Source Entities on July 12, 2010, July 13, 2010, and July 23, 2010 (Docket Nos. 17, 22, and 25) in the captioned case, and placed in the possession and custody of, and under the control of the Receiver.

8.     The receiver has a continuing duty to ensure that there are no conflicts of interest between the Receiver and Staff and those persons or entities engaged or retained by the Receiver, and the Receivership Estate.

## Initial Receivership Engagement, Initial Report

9.     Upon appointment, the Receiver is authorized, empowered, and directed to take such actions necessary to protect, preserve, and maintain Receivership Property while preparing

a report for filing with the Court that, to the best of the Receiver's knowledge as of the period covered by the report: (a) to the extent practicable, includes all information required to be presented in Quarterly Status Reports as set forth below, paragraph 47; (b) assesses the future prospects of success of the Receivership and, in particular, whether the Receivership is likely to amass sufficient (net) assets to warrant a distribution to defrauded investors; (3) makes a recommendation to the Court as to future action, if any, toward the goal of marshaling sufficient assets to return funds to defrauded investors, including both a flat fee and a contingency fee option as a basis for payment with respect to the prospective activity; and (4) includes a proposed Order for the Court (the "Initial Report").

10.     The Receiver shall file the Initial Report within ninety (90) days of appointment. Prior to filing the Initial Report, the Receiver shall discuss the same with the Commission with the goal of submitting an Initial Report without opposition from the Commission. The Commission, and any other party in interest, shall file a response to the Initial Report within ten (10) business days of the filing of the Initial Report.

11.     Upon filing the Initial Report, the Receiver shall cease all activity pending the Court's decision regarding the recommendations set forth in the Initial Report except to the extent necessary to maintain, protect, and preserve the Receiver Records and Receivership Property.

12.     Upon further order of this Court, the Receiver shall proceed in accordance with the Court's direction and, as consistent, pursuant to this Order and the Appointment Order (collectively, the "Receivership Orders").

**Obligations of the Source Entities Upon Appointment of a Receiver**

13.     The Source Entities, including without limitation their past or present partners,

officers, agents, servants, employees, brokers, bankers, facilitators, trustees, escrow agents,

attorneys, accountants, and all persons in concert or participation with them, shall cooperate with

and assist the Receiver in the performance of Receivership duties by, among other things, and to

the extent not already completed in connection with paragraph 3., above:

A.  Immediately transferring to the territory of the United States and delivering
to the Receiver all Receivership Property and Receivership Records,
together with any related documents, records, names and contact
information for persons who may be custodians or otherwise involved with
or knowledgeable of the Receivership Property or Receivership Records,
including without limitation, a list of (a) all employees (and job titles
thereof), other personnel, attorneys, accountants, financial advisers, and any
other agents or contractors of the Source Entities;

B.  Providing to the Receiver forthwith any information that the Receiver deems
necessary to exercising Receivership duties including without limitation
information regarding the location of and access to any and all documents,
computer files and databases in their possession, custody or control relating
to the Receivership Property or Receivership Records, and including
without limitation documents relating to the business operations of the
Source Entities, the offer or sale of securities, the allegations of the
Complaint in this action, and the disposition of investor funds, providing to
the Receiver a full accounting regarding the same;

C.  Advising the Receiver, in writing, of any claims of the Source Entities
against Receivership Property and providing documentation supporting
identified claims;

D.  Providing forthwith all related financial records, computers, computer files,
e-mail, passwords, keys, security cards, access codes for premises, vehicles,
vessels, and aircraft;

E.  Granting immediate access to safes or safe deposit boxes or any other
facility containing Receivership Property or Receivership Records;

F.  Upon the request of the Receiver, executing any consent, authorization,
resolution, or other document as may be required by any person to confirm
the authority of the Receiver and/or to permit the Receiver access to
Receivership Property or Receivership Records;

G. Upon the request of the Receiver, executing any consent, authorization, resolution, or other document as may be necessary to recover from federal, state, and local tax authorities any assets belonging to the Receivership Estate, including without limitation any overpayments of taxes;

H. Upon the request of the Receiver, and subject only to the good faith assertion of privilege, providing to the Receiver complete and responsive answers under oath or under penalty of perjury to all questions posed by the Receiver and Staff;

I. Providing to the Receiver and the Commission copies of the Source Entities' federal income tax returns for 2004 to the present, with all relevant and necessary underlying documentation; and

J. Advising in writing all persons who owe a debt to any of the Source Entities that all debts should be paid to the Receiver;

14.    The Source Entities are required to assist the Receiver in fulfilling Receivership duties and obligations. As such, they must respond promptly, completely, and truthfully to all requests for information and documents from the Receiver.

## Obligations of Third Parties Upon Appointment of a Receiver

15.    All banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody or control of any assets held by or in the name of the Source Entities, or in which any of them, directly or indirectly, has or had any beneficial interest, or over which any of them maintained or maintains and/or exercised or exercises control, specifically including without limitation any past or present bank or other financial or depository institution holding accounts for or on behalf of the Source Entities, or any entities the Source Entities own or control or in which they have an interest or for which any of them is an authorized signatory, that receive actual notice of the Receivership Orders by personal service, facsimile transmission or otherwise shall:

A. Not liquidate, transfer, sell, convey or otherwise transfer any such assets, except upon instructions from the Receiver;

B. Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;

C. Upon presentment of the Receivership Orders, serve on the Receiver a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice, and, as soon as reasonably practicable, provide transaction histories, all account records, and any other Receivership Records to the Receiver;

D. Upon instruction of the Receiver, promptly deliver to the Receiver all Receivership Property in the possession or under the control of any one or more of them and shall promptly surrender all Receivership Records. No separate subpoena shall be required.

E. Cooperate expeditiously in providing information and transferring funds, assets and accounts to the Receiver or at the direction of the Receiver.

16.     Upon entry of the Appointment Order, all persons and entities owing any

obligation, debt, or distribution with respect to an ownership interest to any Source Entity that

receives actual notice of the Receivership Orders by personal service, facsimile transmission or

otherwise, shall, until further Order of this Court, pay all such obligations in accordance with the

terms thereof to the Receiver and the Receiver's receipt of such payments shall have the same

force and effect as if the Source Entities had received such payment.

## General Powers and Duties of Receiver
## with Respect to the Life's Good Funds

Subject to paragraphs 9-12, above:

17.     The Receiver shall have all powers, authorities, rights and privileges heretofore

possessed by the officers, directors, managers and general and limited partners of the Life's

Good Funds under applicable state and federal law, by the governing charters, by-laws, articles

and/or agreements in addition to all powers and authority of a receiver at equity, and all powers

conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 and 1692, and Fed. R. Civ.

P. 66; including without limitation the authority to manage, maintain, and/or wind-down business operations of the Life's Good Funds, and the authority to waive, all privileges, including without limitation the attorney-client privilege, held by all of the Life's Good Funds.

18. The trustees, directors, officers, managers, employees, investment advisors, accountants, attorneys and other agents of the Life's Good Funds are hereby dismissed and the powers of any general partners, directors and/or managers are hereby suspended. Such persons and entities shall have no authority with respect to the Life's Good Funds' operations or assets, except to the extent as may hereafter be expressly granted by the Receiver. The Receiver shall assume and control the operation of the Life's Good Funds and shall pursue and preserve all of their claims.

19. No person holding or claiming any position of any sort with any of the Life's Good Funds shall possess any authority to act by or on behalf of any of the Life's Good Funds.

### General Powers and Duties of Receiver
### with Respect to the Receivership Property

20. Subject to paragraphs 9-12, above and the Receiver's obligation to expend Receivership Property in a reasonable and cost-effective manner, and without further Court order unless specifically stated otherwise herein, the Receiver shall have the following general powers and duties:

    A. To use reasonable efforts to determine the nature, location and value of all Receivership Property, including without limitation monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Source Entities own, possess, have a beneficial interest in, or control directly or indirectly, and assets that may have been conveyed to partners or business associates of the Source Entities, to third parties, or otherwise concealed;

B. To take custody, control and possession of all Receivership Property and records relevant thereto from the Source Entities, to sue for and collect, recover, receive and take into possession from third parties all Receivership Property and records relevant thereto;

C. To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property;

D. Have exclusive control of, and be made the sole authorized signatory for, all accounts at any bank, brokerage firm, or financial institution that has possession or control of any Receivership Property, with the authority to open and close accounts, and open, close, and manage securities accounts or register them in the name of the Receiver on behalf of the Receivership Estate, with reference to the captioned action;

E. Without breaching the peace, but if necessary with the assistance of local peace officers or U.S. Marshals, enter and secure any premises, wherever located or situated, in order to identify the location or existence of and take possession, custody, or control of Receivership Property or Receivership Records, and take all steps that in the Receiver's judgment is necessary or advisable to secure and protect Receivership Property and Receivership Records, including without limitation, remove from any premises or real estate constituting Receivership Property any person who attempts to interfere with the Receiver and Staff in the performance of their duties, and changing any locks, computer access codes, or other security mechanisms with respect to any premises or other equipment or assets that constitute or contain Receivership Property or Receivership Records; provided however, that prior to such entry, any necessary process is obtained;

F. To manage, control, operate and maintain the Receivership Property and hold in the Receiver's possession, custody and control all Receivership Property, pending further Order of this Court;

G. Make from Receivership Property such ordinary and necessary payments, distributions and disbursements as the Receiver deems advisable or proper for carrying out the directions of, or exercising the authority granted by this Order, including without limitation, any payments of insurance premiums to maintain or procure insurance coverage on Receivership Property; provided, however, that any request for the release of funds not necessary to the proper execution of the Receivership, including without limitation, requests for living and/or legal expenses of the Source Entities, must be submitted by motion to the Court for adjudication unless the SEC has agreed, in writing, to not oppose the requested payment(s). Any payment, distribution, or disbursement made by the Receiver pursuant to this paragraph and without Court Order, shall be documented in the next filed Receiver's Report;

H. Take actions in the interest of the Receivership Estate, including without limitation to preserve or increase Receivership Property, and including without limitation, collecting of rents; continuing or terminating employment arrangements, leases, or contracts; and selling, abandoning, renting, leasing, pledging, hypothecating, or otherwise disposing of Receivership Property; provided, however, that any such action shall be described in the next filed Receiver's Report; and provided that any sale of real property be only upon further Order of this Court, pursuant to such procedures as may be required by this Court and additional authority such as 28 U.S.C. §§ 2001 and 2004.

I. To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers, trustees, control persons, and agents of the Life's Good Funds;

J. Compromise or settle any claim of any creditors of the Life's Good Funds and/or any claims specific to Receivership Property, including without limitation claims by the Source Entities against the Receivership Property, and those instances in which Receivership Property serves as collateral to secured creditors; and, in connection therewith, surrender such assets to secured creditors or claimants upon such conditions as the Receiver determines are appropriate, including without limitation the waiver of any deficiency of collateral and release of any underlying obligation secured by the collateral;

K. Determine the identity of all investors in the Life's Good Funds, the amounts invested, and previous payments to, or for the benefit of, such parties;

L. To issue subpoenas for documents and testimony and engage in formal discovery on behalf of the Receivership Estate pursuant to the Federal Rules of Civil Procedure and applicable Local Rules, except for the provisions of Fed. R. Civ. P. 26(d)(1), or on Court –approved adjusted procedures as, in the Receiver's discretion, are necessary and appropriate;

M. Investigate the manner in which the financial and business affairs of the Source Entities were conducted to determine if the Receivership Estate has claims related to the same;

N. After consulting with Commission counsel, institute, prosecute, defend, compromise, or adjust any actions or proceedings based on law or equity now pending or hereinafter instituted in this Court, or pertaining to Receivership Property, Receivership Records, or the Receivership Estate, as may in the Receiver's discretion be necessary or advisable in order to carry out Receivership duties as set forth herein and to effectuate the Court's orders, including, in the event that it is not practicable to recover Receivership Properties from third parties (such as investors in the Life's Good Funds or recipients of gifts or donations from the Source Entities) on a consensual basis

without litigation, to institute and pursue, on behalf of and for the benefit of the Receivership Estate, in this Court or in any court of competent jurisdiction such actions or proceedings to impose a constructive trust, obtain possession and/or recover judgment with respect to persons or entities that hold, control, and/or received, directly or indirectly, assets or funds or proceeds from the Source Entities; provided, however, that prior to filing any action against any investor in the Life's Good Funds, the Receiver will determine whether the Commission objects to the filing of the action, and if so, shall seek, under seal, leave from the Court to file the action, with the Commission having five business days in which to file their objection(s), under seal, to the filing of the action;

O. Seek, among other legal and equitable relief, the imposition of constructive trusts, disgorgement of profits, asset turnover, avoidance of fraudulent transfers, rescission and restitution, collection of debts, and such other relief from this Court as may be necessary to enforce the Receivership Orders;

P. During the pendency of the Receivership and prior to the final implementation of any Distribution Plan, receive, maintain, and include in any distribution, any additional sums ordered or paid to compensate victims of the fraud alleged in this matter of which the Receiver has notice and which are directed to the Receiver for distribution in this manner and,

Q. Prepare and file with the Court a Plan of Distribution providing for interim and/or final distributions with respect to the Receivership Property and, as ordered, any other assets collected in this matter or any related matter for approval by the Court; provided, however, that prior to filing such Plan of Distribution, the Receiver will first submit the same to the Commission determine whether the Commission objects to the , and if so, shall seek, under seal, leave from the Court to file the action, with the Commission having ten business days in which to file their objection(s), under seal, to the filing of the action.

R. Apply to this Court, with Notice provided as specified in paragraph 28 below, for issuance of such other orders as may be necessary or in the judgment of the Receiver advisable in order to carry out the mandate of this Court and the duties of the Receiver.

## Preservation of Real Property and its Content

21.     Upon receiving actual notice of this Order by personal service, facsimile

transmission or otherwise, all persons other than law enforcement officials acting within the

course and scope of their official duties, are (without the express written permission of the

Receiver) prohibited from: (a) entering such premises; (b) removing anything from such premises; or, (c) destroying, concealing, altering, or erasing anything on such premises.

22.     The Receiver shall have exclusive control of access to any Receivership Real Property. The Source Entities, or any other person acting or purporting to act on their behalf, are ordered not to change the locks in any manner, nor to have duplicate keys made, nor shall they have keys in their possession during the term of the Receivership.

23.     Subject to payment for services provided, any entity furnishing water, electric, telephone, sewage, garbage or trash removal services to the Source Entities shall maintain such service and transfer any such accounts to the Receiver unless instructed otherwise by the Receiver.

## Assistance of the U.S. Marshal Service

24.     Upon the request of the Receiver, the United States Marshal Service, in any judicial district, is hereby ordered to assist the Receiver in carrying out Receivership duties to take possession, custody and control of, preserve, secure, or identify the location of, any Receivership Property or Receivership Records.

## Access to Correspondence

25.     The Receiver is authorized to instruct the United States Postmaster to forward delivery to the Receiver and Staff of any mail addressed to the Source Entities or any company or entity under the direction or control of the Source Entities ("Source Entity Mail"), and open, inspect, and take possession and control all such mail to determine the location or identity of Receivership Property and/or to otherwise act pursuant to this Order.  Following such instruction, the Postmaster shall not comply with, and shall immediately report to the Receiver, any change of address or other instruction given by anyone other than the Receiver concerning

the Source Entity Mail. Upon entry of the Appointment Order, the Source Entities shall immediately turn over such mail, regardless of when received, to the Receiver. All personal mail of any individual Source Entities, and/or any mail appearing to contain privileged information, and/or any mail not falling within the mandate of the Receiver, shall be released to the named addressee by the Receiver. The foregoing instructions shall apply to any proprietor, whether individual or entity, of any private mail box, depository, business or service, or mail courier or delivery service, hired, rented or used by the Source Entities. The Source Entities shall not open a new mailbox, or take any steps or make any arrangements to receive mail in contravention of this Order and/or the Appointment Order, whether through the U.S. mail, a private mail depository or courier service.

### Notice and Service

26. In furtherance of the Receiver's responsibilities in this matter, the Receiver is authorized to communicate with, and/or serve this Order upon, any person, entity or government office that the Receiver deems appropriate to inform them of the status of this matter and/or the financial condition of the Receivership Estate. All government offices which maintain public files of security interests in real and personal property shall, consistent with such office's applicable procedures, record this Order upon the request of the Receiver or the Commission.

27. This Order may be served by any means, including without limitation facsimile transmission or e-mail with delivery receipt, upon any financial institution or other entity or person that may have possession, custody, or control of any Receivership Records or Receivership Property or information relevant to this Receivership.

28. Unless otherwise provided herein or by Court Order, "Notice" by the Receiver of an event or filing under this Order shall be deemed complete upon (a) provision of notice, or a

copy of the filing at issue, including without limitation all filings with the Court, to the

Commission, the Defendants and Relief Defendants, and, with the exception of the sealed filings

described in the last sentence of paragraph 20.N., above, any person or entity which, in the

Receiver's sole discretion, is directly impacted by the event or filing; and (b) publication of the

notice or filing at issue, including without limitation all unsealed filings with the Court, on a

public website maintained by the Receiver and/or the Receiver's agents. Notice of this website

shall be provided by the Receiver to parties in interest, including the Defendants, Relief

Defendants, and known partners and/or investors and known creditors, along with a mechanism

for alternative service for persons without internet access. Until and unless the Receiver receives

written notification of change by the affected individual or entity, Notice may be effected by

facsimile, first class mail, or any receipted mail, to (i) the Commission at the address that

follows, (ii) the Defendants and Relief Defendants at the address(es) of record with the Court

clerk, and (iii) all other persons or entities at their last publicly known address or address filed

with the Clerk of Court.

Catherine E. Pappas, Esq.
**United States Securities and**
  **Exchange Commission**
701 Market Street, Suite 2000
Philadelphia, PA 19106
Facsimile: 215-597-2740

## Injunction Against Interference or Obstruction

29.     All persons, including without limitation the Source Entities, their past or present

partners, officers, agents, servants, employees, brokers, bankers, facilitators, trustees, escrow

agents, attorneys, accountants, creditors, claimants, and all persons in concert or participation

with them, and all other entities or persons who receive actual notice of the Receivership Orders,

by personal service, facsimile or otherwise, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without permission from the Court, or upon the appointment of a Receiver, the express written agreement of the Receiver, which would:

A.  Interfere with the Court's or Receiver's efforts to take control, possession, or management of any Receivership Records or Receivership Property; such prohibited actions include but are not limited to, using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Property;

B.  Hinder, obstruct or otherwise interfere with the Receiver in the performance of Receivership duties; such prohibited actions include but are not limited to, destroying, concealing, altering, disposing of or disturbing the Receivership Property and Receivership Records;

C.  Dissipate or otherwise diminish the value of any Receivership Property; such prohibited actions include but are not limited to, releasing claims or disposing, transferring, exchanging, assigning or in any way conveying any Receivership Property, enforcing judgments, assessments or claims against any Receivership Property or any Receivership Defendant, attempting to modify, cancel, terminate, call, extinguish, revoke or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement or other agreement executed by any Receivership Defendant or which otherwise affects any Receivership Property; or,

D.  Interfere with or harass the Court or the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estate by initiating any proceeding pursuant to the United States Bankruptcy Code or otherwise.

## This Court's Jurisdiction and Stay of Litigation

30.  All claims against and all actions to determine disputes relating to Receivership Property or Receivership Records shall be filed in this Court. This provision shall not apply to any criminal proceedings against the Source Entities.

31.     Except by leave of this Court, any and all civil actions or other proceedings, including without limitation, any proceeding initiated pursuant to the United States Bankruptcy Code, against the Source Entities, or involving the Receivership Property or Receivership Records, other than those within the scope of this Receivership and any additional charges in the captioned action brought by the Commission, are hereby stayed.  Any person or entity wishing to continue to pursue or initiate a civil action or other proceeding against the Source Entities, Receivership Property, Receivership Records, or the Receiver may do so only after obtaining express permission from this Court to do so.  Any claim or suit that seeks recovery from Receivership Property, or that is hereinafter filed against the Source Entities, Receivership Property, Receivership Records, or the Receiver, shall be filed in this Court in the within Receivership proceedings; provided, however, that actions may be filed and stayed to toll any applicable statute of limitations.  This paragraph does not stay the commencement or continuation of an action or proceeding by the Receiver pursuant to this Order, or any governmental unit, including without limitation the Commission or criminal authorities, in connection with such governmental unit's regulatory or enforcement powers.

## Tax Treatment

32.     The Receiver shall take all necessary steps to enable the Receivership Estate to obtain and maintain the status of a taxable "Settlement Fund," within the meaning of Section 468B of the Internal Revenue Code and of the regulations, when applicable.  The Receiver shall be designated the administrator of the Settlement Fund, pursuant to Treas. Reg. § 1.468B-2(k)(3)(i), and shall satisfy the administrative requirements imposed by Treas. Reg. § 1.468B-2, including without limitation (a) obtaining a taxpayer identification number, (b) timely filing applicable federal, state, and local tax returns and paying taxes reported thereon, and (c)

satisfying any information, reporting or withholding requirements imposed on distributions from the Settlement Fund. The Receiver shall cause the Settlement Fund to pay taxes in a manner consistent with treatment of the Settlement Fund as a "Qualified Settlement Fund." The Source Entities shall cooperate with the Receiver in fulfilling the Settlement Funds' obligations under Treas. Reg. § 1.468B-2.

## Liability of Receiver

33.     Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with the Receiver's fiduciary obligations in this matter.

34.     The Receiver and Staff, acting within scope of such agency are entitled to rely on all outstanding rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Receiver or the Receiver's Staff be liable to anyone for their good faith compliance with their Receivership duties and responsibilities.

35.     Nothing herein shall limit the immunity of the Receiver and Staff allowed by law or deprive the Receiver and Staff of indemnity for any act or omission for which they otherwise have immunity.

36.     This Court shall retain jurisdiction over any action filed against the Receiver or the Receiver's Staff based upon acts or omissions committed in their representative capacities.

## Resignation of Receiver

37.     In the event the Receiver decides to resign, the Receiver shall first give written notice to the Commission's counsel of record and the Court of its intention, and the resignation

shall not be effective until the Court appoints a successor. The Receiver shall then follow such instructions as the Court may provide.

## Quarterly Reports

38.     Within thirty (30) days after the end of each calendar quarter thereafter, the Receiver shall file and serve a full report and accounting of each Receivership Estate(the "Quarterly Status Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the existence, value, and location of all Receivership Property, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Estate; provided however, that the Initial Report shall be deemed the first Quarterly Status Report.

39.     The Quarterly Status Report shall contain the following:

A.     A summary of the operations of the Receiver;

B.     The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C.     A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

D.     A description of all known Receivership Property, including without limitation approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E.     A description of liquidated and unliquidated claims held by the Receivership Estate, including without limitation the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F.  A list of all known creditors with their addresses and the amounts of their claims;

G.  The status of Creditor Claims Proceedings, after such proceedings have been commenced; and,

H.  The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.

40.  On the request of the Commission, the Receiver shall provide to the Commission any documentation that the Commission deems necessary to meet its reporting requirements mandated by law, regulation, or that is otherwise necessary to further the Commission's mission.

## Fees, Expenses and Accountings

41.  Subject to paragraphs 42-48 immediately below and paragraph 20.G., above, the Receiver need not obtain Court approval prior to the disbursement of Receivership Funds for expenses in the ordinary course of the administration and operation of the receivership. Further, prior Court approval is not required for payments of applicable federal, state or local taxes.

42.  Subject to paragraph 43 immediately below, the Receiver is authorized to solicit persons and entities ("Retained Personnel") in addition to those included in the Appointment Order to assist the Receiver in carrying out the duties and responsibilities described in this Order. The Receiver shall not engage any Retained Personnel without first obtaining an Order of the Court authorizing such engagement.

43.  The Receiver and Staff, and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estate as described in the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the "Billing Instructions") agreed to by the Receiver and Staff. Such compensation shall require the prior approval of the Court.

44.     Within forty-five (45) days after the end of each calendar quarter, the Receiver

and Staff, and Retained Personnel shall apply to the Court for compensation and expense

reimbursement from the Receivership Estate (the "Quarterly Fee Applications").  At least thirty

(30) days prior to filing each Quarterly Fee Application with the Court, the Receiver will serve upon

counsel for the Commission a complete copy of the proposed Application, together with all exhibits

and relevant billing information in a format acceptable to the Commission counsel.

45.     All Quarterly Fee Applications will be interim and will be subject to cost benefit

and final reviews at the close of the receivership.  At the close of the receivership, the Receiver

will file a final fee application, describing in detail the costs and benefits associated with all

litigation and other actions pursued by the Receiver during the course of the receivership.

46.     Quarterly Fee Applications will be subject to a holdback in the amount of 20% of

the amount of fees and expenses for each application filed with the Court.  Subject to paragraph

45 immediately above, the total amounts held back during the course of the Receivership will be

paid out at the discretion of the Court as part of the final fee application submitted at the close of

the receivership.

47.     Each Quarterly Fee Application shall:


A.      Comply with the terms of the Billing Instructions agreed to by the
         Receiver; and,

B.      Contain representations (in addition to the Certification required by the
         Billing Instructions) that: (i) the fees and expenses included therein were
         incurred in the best interests of the Receivership Estate; and, (ii) with the
         exception of the Billing Instructions, the Receiver has not entered into any
         agreement, written or oral, express or implied, with any person or entity
         concerning the amount of compensation paid or to be paid from the
         Receivership Estate, or any sharing thereof.

48.     At the close of the Receivership, the Receiver shall submit a Final Accounting, in a format to be provided by Commission staff, as well as the Receiver's final application for compensation and expense reimbursement.

## **Continued Jurisdiction**

49.     This Order shall remain in effect unless and until modified by further order of this Court, and that this Court shall retain exclusive jurisdiction of the within proceedings for all purposes.

Date: 9-10-10

_____
The Honorable Berle M. Schiller

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff | : | Civil Action No. |
| | : | 10-CV-03130 (BMS) |
| v. | : | |
| | : | |
| ROBERT STINSON, JR. | : | |
| LIFE'S GOOD, INC. | : | |
| LIFE'S GOOD STABL MORTGAGE FUND, LLC | : | |
| LIFE'S GOOD HIGH YIELD MORTGAGE | : | |
| FUND, LLC | : | |
| LIFE'S GOOD CAPITAL GROWTH FUND, LLC | : | |
| IA CAPITAL FUND, LLC | : | |
| KEYSTONE STATE CAPITAL CORPORATION | : | |
| | : | |
| Defendants, and | : | |
| | : | |
| FIRST COMMONWEALTH SERVICE COMPANY | : | |
| SUSAN L. STINSON | : | |
| CHRISTINE A. STINSON | : | |
| MICHAEL G. STINSON | : | |
| LAURA MARABLE | : | |
| | : | |
| Relief Defendants. | : | |

A TRUE COPY CERTIFIED TO FROM THE RECORD
DATED : 9/14/10
ATTEST: Terry Milano
DEPUTY CLERK, UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

## ORDER APPOINTING RECEIVER

NOW, this **13th** day of **September, 2010**, it is **ORDERED, ADJUDGED AND DECREED THAT:**

### I.

**Kamian Schwartzman** is hereby appointed Receiver for the Receivership Estate established by Order dated September 10, 2010 (the "Receivership Order"). No bond shall be

this Order. Kamian Schwartzman (the "Receiver") is authorized to retain **Gaetan Alfano, Esq.** as the Receiver's Counsel, in connection with this appointment. With the Court's approval, the Receiver, and the Receiver's Counsel shall be compensated from the Receivership Assets for all reasonable fees and costs.

Until and unless otherwise Ordered by this Court, the agreed upon fee schedules are as follows, which hourly fee rates are hereby found to be reasonable:

### Receiver

| Name | Rate |
|------|------|
| Kamian Schwartzman | 300 |

### Receiver's Counsel

| Name/ Position | Rate |
|----------------|------|
| Gaetan Alfano | 250 |
| Associates | Up to 200 |
| Paralegals | 100 |

The Receiver's Counsel may add or substitute other professionals with comparable experience at comparable rates, with the written approval of the Receiver and the Commission.

### II.

### Continued Jurisdiction

This Order shall remain in effect unless and until modified by further order of this Court, and this Court shall retain exclusive jurisdiction of the within proceedings for all purposes.

Date: 9/13/2010                                     The Hon. Berle M. Schiller